IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Uhlig, LLC, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>John Adam Shirley, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 6:08-1208-HFF-WMC<br><br>**ORDER AND<br><u>REPORT OF MAGISTRATE JUDGE</u>** |

This matter is before the court on the plaintiff's motion for temporary restraining order and preliminary injunction and for expedited hearing (doc. 5). The Honorable Henry F. Floyd, United States District Judge, originally referred the motion to this court for mediation. However, because of the posture of the case, this court determined that mediation of the issues involved would not be fruitful. Accordingly, on May 7, 2008, Judge Floyd referred the motion to this court for a recommendation. The defendants filed opposition, and a hearing on the motion was held on May 7, 2008.

In determining whether to grant injunctive relief prior to trial, a court must consider:

(a)     The plaintiff's likelihood of success in the underlying dispute between the parties;

(b)     whether the plaintiff will suffer irreparable injury if the injunction is not issued;

(c)     the injury to the defendant if the injunction is issued; and

(d)     the public interest.

*Scotts Company v. United Industries Corporation*, 315 F.3d 264, 271 (4th Cir. 2002); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 193 (4th Cir. 1977).

The court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction were to be denied; if so, then the court must balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant if the injunction were issued. *Scotts*, 315 F.3d at 271. If the balance tips decidedly in favor of the plaintiff, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." However, if the balance does not tip decidedly there must be a strong probability of success on the merits. *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812-13 (4th Cir. 1991). Lastly, the court must evaluate whether the public interest favors granting preliminary relief. *Id.* at 814.

The plaintiff alleges causes of action against the defendants for copyright infringement, violation of the Digital Millennium Copyright Act, violation of the Computer Fraud and Abuse Act, misappropriation of trade secrets in violation of the South Carolina Trade Secrets Act, conversion, passing off and trademark infringement, breach of fiduciary duty, misappropriation of corporate opportunity, tortious interference, and civil conspiracy.

The allegations of the plaintiff are as follows:

Since October 12, 1999, Defendant John Adam Shirley ("Shirley") was employed by CustomMedia, most recently as its Vice President and highest paid employee. (Uhlig Aff., ¶ 6). CustomMedia is engaged in the business of creating newsletters for residents of multi-unit residential and apartment complexes, and franchise businesses throughout the United States. As its Vice President, Shirley oversaw and was directly involved in marketing, order negotiations, pricing, developing sales opportunities, and providing service to customers. (Uhlig Aff., ¶ 7).

On February 29, 2008, Plaintiff Uhlig, LLC ("Uhlig") (a business that also creates newsletters for residents of multi-unit residential and apartment complexes and franchise businesses throughout the United States), acquired from CustomMedia certain assets (personal, tangible and intangible), personal property and business, including all intellectual property (including, but not limited to proprietary and confidential

information, trade secrets, copyrights, copyrightable material, and trademarks), and all causes of action and claims against third parties. (Uhlig Aff., ¶ 3). Among the intellectual property acquired by Uhlig from CustomMedia are the names, addresses and contact information of each of its customers, pricing calculations, custom content and confidential information concerning each of its customers, its original works of design and looks specific to its customers ("CustomMedia templates"), and the library and database of copyrighted and copyrightable original works of written content for newsletters created by CustomMedia. (Uhlig Aff., ¶ 4). The trade secret information among the assets Uhlig acquired from CustomMedia included, but is not limited to, specific pricing information and worksheets, customer lists, prospect lists, sales presentation notes, deadline breakdowns, master cost worksheets, financial spreadsheets, revenue projections, invoice summaries and analyses, internal vendor information, network maps, custom software designs, production flowcharts and sales compensation worksheets. (Uhlig Aff., ¶ 5).

Under the terms of its agreement to sell certain assets to Uhlig, CustomMedia agreed to retain all employees, including Defendant Shirley, for a period of up to four months to permit the orderly transition of its accounts to Uhlig. (Uhlig Aff., ¶ 8). Certain key employees, including Shirley, also were offered incentive packages related to their role in the transition process, and some, including Shirley, were offered the opportunity to continue a business relationship with Uhlig as independent contractors operating from Greenville after the transfer of accounts to Uhlig. (Uhlig Aff., ¶ 8). Accordingly, upon the close of the asset purchase transaction on February 29, 2008, Shirley continued acting as the Vice President, with access to confidential information and trade secrets now belonging to Uhlig, including trade secret information regarding marketing, order negotiations, pricing, developing sales opportunities, and customers. (Uhlig Aff., ¶ 8).

Uhlig first met individually with Shirley to discuss the transfer plan on February 28, 2008. (Uhlig Aff., ¶ 9). Shirley expressed no objection. (Uhlig Aff., ¶ 9). The following day, February 29, 2008, Uhlig and CustomMedia closed the transaction. (Uhlig Aff., ¶ 10). Unbeknownst to Uhlig at that time, within six hours of the close of the transaction, Shirley's administrative assistant (Jane Doe) began reviewing and/or printing files containing detailed trade secret information now belonging to Uhlig. (Uhlig Aff., ¶ 11).

3

On or about March 2, 2008, a Sunday, Defendant Shirley used his company-owned computer to access at least 19 files containing trade secret information, including sales summaries, commission structures, specific confidential customer information, and detailed proprietary financial information. (Uhlig Aff., ¶ 12). The following day, March 3, 2008, Mark Uhlig ("Mr. Uhlig") learned that Shirley had tendered his resignation as an employee of CustomMedia. (Uhlig Aff., ¶ 13). Upon learning of his resignation, Mr. Uhlig caught up with Shirley in the parking lot. Shirley expressed anger toward CustomMedia and stated he had been working on plans to compete with CustomMedia "for a very long time." (Uhlig Aff., ¶ 13). That evening, Mr. Uhlig took Shirley to dinner and discussed with him a possible future relationship with Uhlig at the end of his employment with CustomMedia in June, 2008, and suggested ideas for a compensation structure. During the dinner meeting, Shirley agreed to rescind his resignation. (Uhlig Aff., ¶ 14).

During the following week, while Shirley and Jane Doe were employees of CustomMedia, and without Uhlig's knowledge, Defendants Shirley and Jane Doe repeatedly accessed key trade secret information for the purpose of setting up a competing business. (Uhlig Aff., ¶ 15). Specifically, on or about March 4, 2008, Defendant Shirley, without authority or permission from Uhlig, or its knowledge, directed a subordinate employee to provide him paper copies and electronic documents consisting of various items of the intellectual property that Uhlig had acquired from CustomMedia on February 29, 2008, including, but not limited to, an electronic spreadsheet containing detailed contact information for CustomMedia's national accounts, and hard copies of specialty print products and newsletter samples for major accounts. (Uhlig Aff., ¶ 16). At the same time, computer records show that Jane Doe accessed detailed customer notes and sales implementation information on several of the company's largest accounts. (Uhlig Aff., ¶ 16). On March 5, 2008, while he was an employee of CustomMedia, Shirley accessed a series of files containing trade secret information that included company financial information, revenue forecasts and projections, and specific detail regarding revenue history. (Uhlig Aff., ¶ 17). Computer records have revealed that, beginning on March 5 and continuing until sometime after her employment with CustomMedia ended, Jane Doe, at the apparent direction of Shirley, accessed multiple files regarding The Sunshine House, an account that generated more than $400,000 in revenue to CustomMedia in 2007. (Uhlig Aff., ¶ 18). On Friday, March 7, 2008, having spent the better part of the week gathering Uhlig's trade secret information, Shirley reiterated to Mr. Uhlig that he

4

was considering Uhlig's offer of a future contract sales position after the anticipated end of his employment with CustomMedia in June, 2008, and Shirley stated he would confer with his wife over the weekend and discuss his continued employment with Mr. Uhlig the following week. (Uhlig Aff., ¶ 19).

On Sunday, March 9, 2008, while the company's offices were closed for business and few, if any, other employees were in the office, Defendants Shirley and/or Jane Doe spent over four hours accessing files containing trade secret information from Uhlig's computer databases, including but not limited to pricing comparisons, specific customer information and artwork, and detailed confidential information regarding key customer accounts. (Uhlig Aff., ¶ 20). In addition, electronic time records show that **prior to** misappropriating Uhlig's trade secrets and proprietary information on March 9, Defendant Shirley first updated his resignation letter, making it effective the next business day, Monday, March 10, 2008. (Uhlig Aff., ¶ 20). Defendant Shirley tendered his resignation to CustomMedia by voicemail on March 9, effective March 10, and terminated his employment with CustomMedia. Shirley also left a resignation letter, dated March 10, at CustomMedia, although he did not return to CustomMedia after he completed his March 9 theft of Uhlig's trade secrets. Sometime over the weekend, Jane Doe slipped a resignation letter dated March 9 under the door of CustomMedia's Human Resources director and did not return to work during business hours. (Uhlig Aff., ¶ 21). After spending nearly the entire day on Sunday, March 9, accessing key trade secret information belonging to Uhlig, Defendant Shirley called Mr. Uhlig and advised him he had decided to resign from CustomMedia. (Uhlig Aff., ¶ 21).

On March 11, 2008, only one day after resigning and two days after spending over four hours downloading Uhlig's trade secrets, Defendants Shirley and Jane Doe made a personal sales visit to The Sunshine House, one of Uhlig's existing customers, pitching competitive newsletter and marketing services. (Uhlig Aff., ¶ 22). As set forth above, during his last week with CustomMedia, Shirley had spent significant time obtaining, without Uhlig's authorization, Uhlig's trade secret information, including specific information regarding The Sunshine House, its contact information, pricing information, purchase history, volume, and customer-specific product templates. (Uhlig Aff., ¶¶ 23). Upon information and belief, Defendant Shirley used Uhlig's proprietary and confidential information, trade secrets, copyrighted material, and other intellectual property when he met with and solicited business from The Sunshine House. (Uhlig Aff., ¶ 22). After meeting with

> The Sunshine House, Shirley e-mailed The Sunshine House, thanked its representative for meeting with him and Jane Doe, and noted that Jane Doe "is working on the implementation plan for the upcoming direct mail and marketing campaigns" and that he is "reviewing your core newsletter pricing and should have some numbers to you tomorrow." (Uhlig Aff., ¶ 24). On or about March 13, 2008, The Sunshine House cancelled its account with Uhlig, but later temporarily rescinded its cancellation. (Uhlig Aff., ¶ 25). Then, by letter dated April 1, 2008, The Sunshine House again terminated Uhlig, stating: "The Sunshine House will be moving its newsletter and direct mail service to another local vendor. . . . Please understand that this decision is based upon budgetary savings and is not a result of any displeasure with the handling of our account by you or your team." (Uhlig Aff., ¶ 25). In 2007 alone, The Sunshine House accounted for more than $400,000 in revenue to CustomMedia. (Uhlig Aff., ¶ 18).

(Pl. m. for TRO 2-7).

Defendant Shirley argues that the names of clients, price information, and samples of Cox CustomMedia's products are available on Cox CustomMedia's website, and therefore this information clearly is neither confidential nor a trade secret. Defendant Shirley claims that the information he accessed and reviewed was for the purpose of evaluating Uhlig's offer to pay him $100,000 not to compete for approximately two years. He advised Mr. Uhlig in writing that he would need to review the costs and financial data regarding customer base in order to evaluate the proposal, and over the next several days he downloaded, copied, and reviewed the records as he told Mr. Uhlig he would do (Shirley aff. ¶ 9, ex. A). Defendant Shirley also argues that Cox CustomMedia never made an effort to treat anything as confidential, proprietary, or a trade secret, and never identified any materials as such (Shirley aff. ¶ 17).

The plaintiff counters that the information could not have been accessed for purposes of reviewing Mr. Uhlig's proposal because defendant Shirley downloaded and copied information before the negotiations began and after the negotiations were terminated. Further, during the weekend of February 29-March 2, defendant Shirley

6

accessed and downloaded detailed information regarding the revenue history, specific account detail, pricing detail, and other trade secrets regarding five specific customers, including the three customers that defendant Shirley has already engaged as customers – The Sunshine House, Barnes & Noble, and Brookdale. Further, large amounts of information about key accounts was removed and/or deleted from the computers of defendant Shirley and his assistant (pl. reply 5, Uhlig aff.).

Clearly the plaintiff will suffer irreparable injury if the injunction is not issued, as it has already lost three of its top customers. The accounts already acquired by defendant Shirley were worth approximately $2,000,000 in recurring annual revenues for the plaintiff (Uhlig aff. ¶ 3). While the injury to the defendant if the injunction is issued could be substantial, this court has attempted to buffer any such injury by recommending that defendant Shirley be allowed to keep any customers whom he has already engaged to service and further be allowed to do business with customers of Cox CustomMedia and/or Uhlig, LLC should they contact him for service. Further, this court is recommending that defendant Shirley be enjoined from soliciting business from only those customers about whom he took information from the plaintiff. This court finds that the balance of harms tips decidedly in the plaintiff's favor. This court further finds that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation. Lastly, as argued by the plaintiff, protecting trade secrets and ensuring fair competition are important public interests.

Based upon the arguments and briefs of the parties and the foregoing law, this court recommends that a temporary restraining order be issued and that the order provide the following:

1. Defendant Shirley and his newly-formed company, Prism Content Solutions, LLC, are entitled to fairly compete with Uhlig, LLC.

2.      In the course of generating business for Prism Content Solutions, LLC, defendant Shirley may not solicit the customers of Cox CustomMedia and/or Uhlig, LLC, for which he took the information that is at issue in this case. The plaintiff has raised serious issues going to the merits of its claims, particularly the conversion claim. This court finds that equity will not allow defendant Shirley to benefit from the taking by allowing him to use the information that was taken to solicit the business of the plaintiff's customers. *See Taff v. Smith*, 103 S.E. 551, 553 (S.C. 1920) (quoting equity maxim, "No person shall be allowed to reap the benefits arising from his own wrongful acts"). While defendant Shirley is prohibited from soliciting business from these particular customers, he is not prohibited from receiving such business should customers of Cox CustomMedia and/or Uhlig, LLC, contact him for service.

> [T]he proper scope of this type of injunction should be one which "does not interfere with the respondents' right to do business with [the former] customers; but ... forbids initiation of that business by the use of [confidential] information.... Acceptance of patronage of all who voluntarily decide to employ [respondents] is not interfered with; only solicitation ... is forbidden." *Colonial Laundries, Inc. v. Henry*, 138 A. 47, 50 (R.I.1927). The end result is a less restrictive injunction which prevents the defendant from using the property rights of the plaintiff, but allows him to continue to have similar business opportunities as other non-related competitors.

*Catalog Marketing Services, Ltd. v. Savitch*, 1989 WL 42488, *4 (4th Cir. 1989) (unpublished). Further, defendant Shirley may continue to service the accounts he has already engaged as of the date of this order. However, defendant Shirley and all persons acting on his behalf or on behalf of any company in which Shirley has any ownership, employment relationship, or business affiliation are precluded from using or revealing in any manner trade secrets, as defined in South Carolina Code Ann. § 39-8-110(5), of Cox CustomMedia and/or Uhlig, LLC.

3.      In dealing with his current customers or former customers of Cox CustomMedia and/or Uhlig, LLC, who may come to him in the future for service, defendant

8

Shirley is entitled to use any information that was or could be supplied by the customers or prospects of Cox CustomMedia and/or Uhlig, LLC, with the exception of any trade secrets as defined in South Carolina Code Ann. § 39-8-20(5).

4. Defendant Shirley shall return to the plaintiff all documents, materials, and other information, whether in paper or electronic form, or otherwise recorded, including copies, duplicates of downloaded electronic images thereof, and any other things in his possession or control that have not already been deleted, destroyed, or otherwise disposed of, that defendant Shirley himself, or any person acting on his behalf, including but not limited to Amanda Dorsey, LeGette Shirley, Jennifer Clark, Jeremy Richardson, and Nathan Holman, removed, copied, downloaded, or otherwise obtained at any time from Cox CustomMedia, Inc. or Uhlig, LLC.

5. Defendant Shirley shall return to the plaintiff any and all documents, materials, and other information in his possession or control that have not already been deleted, destroyed, or otherwise disposed of, whether in paper or electronic form, or otherwise recorded, including copies, duplicates, or electronic images thereof, created at any time by defendant Shirley himself, or any person acting on his behalf, including but not limited to Amanda Dorsey, Todd Baldree, LeGette Shirley, Jennifer Clark, Jeremy Richardson, and Nathan Holman, that contains any information or data based upon, taken, copied, or summarized from any documents, materials, and other information, whether in paper or electronic form, or otherwise recorded, that at any time was the property or in the possession of Cox CustomMedia, Inc. or Uhlig, LLC.

6. If defendant Shirley is in possession of any documents, materials, or other information that originated with the plaintiff and/or CustomMedia, Inc., that he believes does not fall into the above categories, the plaintiff shall deposit such items in escrow with an agreed-upon third party.

7. Defendant Shirley is not precluded from filing a motion to have the court declare that any files, documents, electronic devices or any information stored therein, in whole or in part, disposed of prior to this litigation or deposited in escrow are not trade secrets or confidential information.

8. Defendant Shirley shall deposit in escrow with an agreed-upon third party any and all electronic devices, including but not limited to the Blackberry, that he has retained following his employment and with the understanding and consent of Cox CustomMedia.

9. Defendant Shirley shall permit examination and imaging of all computers and any other things, including without limitation any and all Blackberrys or other devices, capable of storing information, documents, or data electronically, utilized or accessed by defendant Shirley or any other person acting on his behalf, including but not limited to Amanda Dorsey, Todd Baldree, LeGette Shirley, Jennifer Clark, Jeremy Richardson, and Nathan Holman, at any time since December 1, 2007, by a third party to verify that no additional documents or materials generated by Cox CustomMedia are in his possession. The parameters of this third party qualified computer forensics expert review is beyond the scope of this order and will be separately negotiated by the parties contemporaneous with its happening. To the extent any additional documents or materials generated by Cox CustomMedia alleged to be trade secrets are revealed in this review, without recourse against defendant Shirley, such documents and material shall be returned to the plaintiff.

10. Defendant Shirley and all persons acting on his behalf or on behalf of any company in which Shirley has any ownership, employment relationship, or business affiliation shall immediately cease and desist from using or disclosing for any purpose any all information, documents, files, and data that may contain confidential information or trade secrets of the plaintiff, as defined in South Carolina Code Ann. § 39-8-20(5).

11. This order shall stay in effect until the hearing on the non-competition agreement.

12. The court hereby directs that this order be filed under seal and that the content of this order not be disseminated to any third party, whether a current or potential customer of either party, or used by either party to disparage one another or in any way used to compete.

13. The plaintiff shall post bond in the amount of $200,000.00.

Wherefore, based upon the foregoing, defendant Shirley's motion to supplement the record (doc. 49) is granted.[1]  It is further recommended that the plaintiff's motion for a temporary restraining order (doc. 5) be granted as set forth above.  The parties shall have until Thursday, May 15, 2008, at 12:00 p.m. to file any objections to this recommendation.

s/William M. Catoe
United States Magistrate Judge

May 13, 2008

Greenville, South Carolina

---

[1] Defendant Shirley filed a motion to supplement the record with the Asset Purchase Agreement between Cox CustomMedia and Uhlig.  The defendant argues that the plaintiff cannot assert a breach of fiduciary duty claim because he was never employed by the plaintiff, and thus he should not be enjoined from contacting customers identified on the documents in question.  The defendant's motion is granted.  However, this court finds that the issue of whether the defendant owed a fiduciary duty to the plaintiff is for the jury and is not dispositive of the issues before this court.  As discussed above, the plaintiff has raised serious issues on the merits of its claims, and in particular the claim of conversion of property owned by the plaintiff, and thus defendant Shirley should not be allowed to benefit from the alleged theft.