**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | | |
|---|---|---|
| UHLIG LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:08-cv-01208-JMC |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| JOHN ADAM SHIRLEY, PRISM | ) | |
| CONTENT SOLUTIONS, LLC, and | ) | |
| EVENTELOPE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court on Defendants John Adam Shirley ("Shirley") and Prism

Content Solutions, LLC's ("Prism" and together with Shirley, "Defendants") Renewed Motion for

Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial [Doc. 999].

## FACTUAL AND PROCEDURAL BACKGROUND

Uhlig is in the business of designing and creating newsletters for residents of multi-unit

residential and apartment complexes and franchise businesses throughout the United States.  On

February 29, 2008, Uhlig acquired substantially all of the assets of Cox CustomMedia, Inc. ("CCM")

and CCM's corporate parent, Cox Newspapers, Inc.  Prior to Uhlig's acquisition of CCM, Shirley

was employed by CCM as its Vice President and as CCM's highest paid full-time employee.  His

employment with CCM was governed by a Non-Competition and Non-Solicitation Agreement (the

"Employment Agreement"). As a result of the acquisition, CCM ceased all active operations but

agreed to retain all employees, including Shirley, for a period of up to four months to permit the

orderly transition of its accounts to Uhlig.   At the beginning of the transition period, Shirley

continued acting as the Vice President, with access to all CCM information. However, Shirley abruptly resigned in March 2008 and began a competing business. Shortly after Shirley's resignation, Uhlig discovered that Shirley had copied and retained certain customer information from company computer files.

On April 3, 2008, Uhlig filed suit against Defendants alleging that Shirley was using confidential and trade secret information of CCM to solicit CCM's customers and unfairly compete against Uhlig. Uhlig twice amended its complaint and ultimately asserted causes of action for copyright infringement, violations of the Computer Fraud and Abuse Act, 18 U.S.C § 1030(g), and the Digital Millennium Copyright Act, 17 U.S.C. § 1201(a), conversion, passing off and trademark infringement, civil conspiracy, misappropriation of corporate opportunity, misappropriation of trade secrets, breach of employment agreement, tortious interference with employment agreements, breach of fiduciary duty and/or duty of loyalty, aiding and abetting a breach of fiduciary duty and/or a duty of loyalty, and tortious interference with prospective contractual relationships against Shirley, Prism, and various other individual and corporate defendants. CCM also intervened in the action for the limited purpose of ensuring that Uhlig had standing to seek effective relief for the alleged misconduct by Defendants regarding the Employment Agreement between CCM and Shirley. In response to Uhlig's complaint and CCM's intervention in the action, Defendants asserted various counterclaims against Uhlig and CCM.

On summary judgment, the court found the non-competition and non-solicitation of advertisers and customers provisions of the Employment Agreement to be unenforceable. *See* Order on Defendants' Motion for Summary Judgment [Doc. 687]. The court also granted Defendants' request for summary judgment on Uhlig's claims for reformation of the Employment Agreement,

civil conspiracy and violations of the Computer Fraud and Abuse Act. *See* Order on Defendants' Motion for Partial Reconsideration [Doc. 703]. In addressing Uhlig's Motion for Partial Summary Judgment, the court determined that Uhlig was entitled to summary judgment on all counterclaims asserted against it by Defendants and Eventelope, with the exception of Prism's counterclaim against Uhlig for declaratory judgment concerning the ownership of a certain source code. *See* Order on Plaintiff Uhlig, LLC's Motion for Partial Summary Judgment [Doc. 698]. Additionally, the court granted summary judgment to CCM as to all counterclaims asserted against it by Defendants and found that Uhlig had standing to enforce the Employment Agreement. *See* Order on Intervener/Plaintiff Cox CustomMedia, Inc.'s Motion for Summary Judgment [Doc. 685]. The court allowed the remaining claims to proceed to trial.

The matter was tried by jury in December 2011, and the jury returned a verdict in favor of Uhlig on all claims and awarded the following damage amounts for the respective claims: two hundred fifty thousand dollars ($250,000.00) actual damages for Misappropriation of Trade Secrets; one million dollars ($1,000,000.00) actual damages for Breach of Employment Agreement; two hundred ninety-two thousand dollars ($292,000.00) actual damages for Tortious Interference with Employment Agreement; one million five hundred thousand dollars ($1,500,000.00) actual damages and twenty thousand dollars ($20,000.00) punitive damages for Breach of Fiduciary Duty/Duty of Loyalty; two hundred fifty thousand dollars ($250,000.00) for Aiding and Abetting a Breach of Fiduciary Duty and/or a Duty of Loyalty; one million dollars ($1,000,000.00) actual damages for Tortious Interference with Prospective Contractual Relationships. On January 18, 2012, Defendants filed the instant motion seeking judgment as a matter of law on all of Uhlig's claims or, alternatively, for a new trial. For the following reasons, the court denies Defendants' Motion.

## <u>STANDARD OF REVIEW</u>

Rule 50(b) of the Federal Rules of Civil Procedure allows the court to consider a renewed motion for judgment as a matter of law after the entry of judgment. Fed. R. Civ. P. 50(b). "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.* The court may grant a motion made under Rule 50(b) only "if there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party." *Cline v. Wal-Mart Stores*, 144 F.3d 294, 301 (4th Cir. 1998) (citations omitted). "[T]he evidence and all reasonable inferences from it are assessed in the light most favorable to the non-moving party, and the credibility of all evidence favoring the non-moving party is assumed." *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 160 (4th Cir. 1988) (internal citations omitted). "If reasonable minds could differ about the result in this case, [the court] must affirm the jury's verdict." *Bryant v. Aiken Reg'l Med. Centers, Inc.*, 333 F.3d 536, 543 (4th Cir. 2003).

Additionally, a Rule 59(a) motion for new trial is a matter "resting in the sound discretion of the trial judge." *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999). A new trial should be granted "only if (1) the verdict is against the clear weight of the evidence, (2) is based on evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002) (citations omitted). In considering a motion for a new trial, the court "must view the evidence in the light most favorable to the prevailing party." *Perrin v. O'Leary*, 36 F. Supp. 2d 265, 266 (D.S.C. 1998). "Such a motion should be denied, unless there were substantial errors in evidentiary rulings or jury charges, or unless

'the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable people could not disagree on the verdict.'" *Id.* (quoting *Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995).

## DISCUSSION

### Defendants' Challenge to the Jury's Verdict on Damages

#### A. Sufficiency of the Evidence in Support of the Verdict

Defendants argue that they are entitled to a new trial because there is no evidence to support the damages awarded by the jury. Defendants assert that the jury's verdict is not supported by the evidence because the verdict does not match any of the damage figures submitted by Uhlig through the expert witness testimony of Dr. Perry Woodside. In so arguing, Defendants cite no legal authority to support their argument and incorrectly imply that a jury may only award the exact amount of damages requested by the plaintiff. However, it is well established that "the amount of damages, actual or punitive, remains largely within the discretion of the jury." *James v. Horace Mann Ins. Co.*, 371 S.C. 187, 195, 638 S.E.2d 667, 671 (2006) (citing *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991)); *see also TransDulles Center, Inc. v. USX Corp.*, 976 F.2d 219, 228 (4th Cir. 1992) (acknowledging that the determination of the appropriate amount of damages recoverable for a claim is within the province of the jury). The jury was not required to return a verdict awarding damages in the precise amounts presented by Dr. Woodside. Instead, as the court charged, the jury was only required to award damages in the amount which it determined to be just and reasonable based on the evidence. Therefore, the court finds no merit in Defendants' argument that the damage awards are not supported by the evidence.

5

## B. Inconsistencies in the Verdict

Defendants also contend that a new trial is warranted because the verdict is inconsistent. According to Defendants, the mere fact that the jury awarded damage amounts which are not the same for all causes of action demonstrates that the verdict is inconsistent. Again, Defendants cite no legal authority for their position and the court finds this argument to be without merit.

"It is the duty of the court to sustain a verdict when a logical reason for reconciling the verdict can be found." *See Orangeburg Sausage Co. v. Cincinnati Ins. Co.*, 316 S.C. 331, 345, 450 S.E.2d 66, 74 (Ct. App. 1994) ("Although the jury awarded different amounts under each theory, this does not mean the verdicts are inconsistent. Different damages are recoverable under each claim, and the trial court instructed the jury as to the appropriate measure of damages under each claim.").

Although Defendants insist that the causes of action asserted by Uhlig against Defendants overlap such that the damage awards for each claim should have been identical, Defendants wholly ignore that Uhlig submitted evidence during trial which would have allowed the jury to distinguish between many of the claims. For example, Uhlig's claim for misappropriation of trade secrets was premised on allegations that Defendants wrongfully took possession of and misappropriated various compilation trade secrets which included detailed customer information. However, Uhlig also submitted separate evidence concerning Defendants' actions in unlawfully possessing confidential information and soliciting CCM employees which would independently support its claim for breach of contract. Furthermore, Uhlig presented evidence that Defendants contacted CCM customers and engaged in clandestine efforts to persuade them to abandon long-existing relationships with CCM, effectively thwarting Uhlig's efforts to smoothly transition the customers to Uhlig. Uhlig focused the majority of the evidence in the case on Shirley's personal actions and presented significantly less

evidence to implicate Prism independently. Uhlig also presented evidence on damages in a manner which would have allowed the jury to make individualized determinations of the appropriate damage amounts by customer and according to the extent of liability it assessed for Shirley and Prism. Accordingly, it is logical and reasonable that the jury could have determined different damage amounts for the different causes of action depending on the jury's conclusions on the evidence presented at trial.

### C. Aggregation of the Verdict

Defendants further assert that the verdict is ambiguous and violative of Defendants' Seventh Amendment rights. The crux of Defendants' argument is that the verdict should not be aggregated, but that Uhlig should be required to elect between the remedies on which it seeks to recover.

"A district court may aggregate verdicts without violating the seventh amendment right to a jury trial if the verdicts are logical and probable only if they are aggregated." *Richmond v. Madison Management Group, Inc.*, 918 F.2d 438, 461 (4th Cir. 1990) (citation and internal quotation marks omitted). "The requirement that aggregation occur only if the aggregated verdict is what the jury must have intended stems from the fact that a district court's reexamination of record evidence is barred by the Seventh Amendment." *Id*.

In this case, it is clearly logical and probable that the jury intended its verdict to be aggregated to the extent that the verdict did not represent duplicative recovery. Prior to submission of the case to the jury for deliberation, the court instructed the jury as follows:

> Plaintiff's claims in this case are based upon alternative or concurrent theories of liability. Although Plaintiff claims alternate theories of liability, Plaintiff may not recover twice for the same injury. In your deliberation on these alternative or concurrent theories, any damages awarded on a claim must be supported by evidence

relating to that claim and damages for one claim may not be duplicative of damages awarded in another claim which is based on the same injury.

Before the court submitted the case to the jury, the court gave instructions which expressly informed the jury that Uhlig would not be entitled to more than one recovery for the same injury. Additionally, after much discussion between the parties and the court, the jury was further instructed on the face of the verdict form that it should award damages for each individual cause of action to which it believed Uhlig was entitled and that the court would review the verdict to ensure that there was no duplicative recovery.   The verdict form provided:

> Plaintiff may not receive multiple recoveries for the same injury, even if you found any or all of Defendants liable under multiple alternative theories.  Nonetheless, if you decide that Plaintiff is entitled to an award of actual damages on any given claim, you should award such actual damages on that claim as is appropriate under the court's instructions.  Upon receipt of your verdict, the court will review the award to ensure that Plaintiff does not receive a double or duplicative recovery.

The parties reviewed the verdict form prior to its submission to the jury and agreed on the format of the form finally submitted to the jury for use in returning its verdict.  Although both parties make much of the jury's totaling of the damages awards on the individual claims, there is nothing to indicate that the jury intended to do anything other than what the court instructed – which was to make an individualized determination of damages for each cause of action and leave to the court to eliminate any portion of the awards which were found to be duplicative.  Because the court has issued an order requiring an election of remedies but allowing the aggregation of the recoveries Uhlig ultimately elects, the court has achieved the "most equitable result, and a result that is consistent with the jury's verdict."  *See Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am.*, 16 F.3d 410 (table), No. 93–1176, 1994 WL 34745, at * 5 (4th Cir. Feb.3, 1994). Accordingly,

the court denies Defendants' request for a new trial on the grounds that the verdict is defective or unsupported by the evidence.

## Misappropriation of Trade Secrets

### A. Identification of Trade Secrets

Defendants claim that they are entitled to a judgment as a matter of law or, in the alternative, a new trial on Uhlig's claim against them for misappropriation of trade secrets. Specifically, Defendants contend that Uhlig failed to sufficiently identify the trade secrets at issue in this case and, even if the trade secrets were sufficiently identified, Uhlig also failed to demonstrate that the alleged trade secrets constituted an interrelated "series" or "sequence" of components. The court rejects these arguments.

A plaintiff must adequately identify and describe the subject matter of its trade secrets in sufficient detail to establish each statutory element of a trade secret and to enable the jury to differentiate that which is claimed as a trade secret from "matters of general knowledge in the trade." *Trandes Corp. v. Guy F. Atkinson, Co.*, 996 F.2d 655, 661-62 (4th Cir. 1993). A trade secret may exist in a unique combination or compilation of information otherwise publicly available. *See Lowndes Products, Inc.*, 259 S.C. at 327, 191 S.E.2d at 764. *See also Woven Elecs. Corp. v. Advance Grp., Inc.*, 930 F.2d 913, Nos. 89–1580 & 89–1588, 1991 WL 54118, at *3 (4th Cir. Apr.15, 1991), *as amended* May 6, 1991. However, such a compilation trade secret must be sufficiently identified to provide reasonable details concerning the information which makes up the secret and how that information relates together to form the secret. *See Decision Insights, Inc. v. Sentia Group, Inc.*, 311 Fed. Appx. 586, 594-95 (4th Cir. 2009) ("*Decision Insights I*") (dismissing

certain parts of a trade secret claim for plaintiff's failure to identify the relevant portions of source code in a computer program which corresponded to its trade secret claim).

A compilation trade secret is, generally, not an amorphous collection of information. Instead, the compilation must work together to embody a definite methodology, process, technique, or strategy. *See, e.g.*, *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009) (citations omitted) (finding that a select market data analysis based on special knowledge of specific customer needs and preferences contained in "[c]ustomer pricing lists, cost information, confidential customer lists, and pricing and bidding formulas may constitute trade secrets" sufficient to warrant a preliminary injunction); *Guang Dong Light Headgear Factory Co., Ltd. v. ACI Int'l, Inc.*, No. 03-4165-JAR, 2008 WL 53665, at *15-16 (D. Kan. Jan. 2, 2008) (finding plaintiff's identification of trade secrets as collective information used to manage a specific customer relationship, including "price quote requests, sample requests, pricing, specification information, actual samples that had been submitted, purchase orders, sales orders, specifications, and shipments" was sufficiently identified to overcome summary judgment in suit against former employee who misappropriated a customer prospect after forming his own company); *Tan-Line Studios v. Bradley*, 1 U.S.P.Q.2d 2032, 2038 (D. Pa. 1986) (noting that plaintiff had meticulously developed a cohesive and defined strategy for the development, marketing, and operation of an indoor tanning studio such that the plaintiff's "entire methodology for conducting a tanning studio constitutes a trade secret. Therefore, plaintiff need not identify with specificity those individual aspects of [plaintiff's] business about which [defendant] appropriated information."); *Wilkes v. Pioneer Am. Ins. Co. of Fort Worth, Texas*, 383 F. Supp. 1135, 1140 (D.S.C. 1974) (acknowledging that a specific method of marketing insurance products based on compilation of publicly available materials could constitute a trade

10

secret). The identification must enable the court and the jury to engage in a meaningful analysis of the trade secret claim. *Decision Insights, Inc.*, 311 Fed. Appx. at 595. Additionally, the identification must amount to more than simply a reference to lists of categories or documents containing general areas of information and unidentified trade secrets. *See c.f. Carolina Chem. Equip. Co., Inc. v. Muckenfuss*, 322 S.C. 289, 296, 471 S.E.2d 721, 725 (Ct. App. 1996) (finding that the identification of a trade secret in a contractual provision was "so broad[] that virtually all of the information [defendant] acquired during his employment would fall within its definition") (citations omitted); *see IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (noting that a plaintiff pursuing a trade secret claim "must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition").

The court finds that Uhlig provided Defendants with a sufficient identification of several compilation trade secrets. Particularly, the court finds that Uhlig has adequately delineated compilation trade secrets in certain information which relates to specific customer accounts including: i) historical sales and ordering information; ii) cost, production and workflow information; iii) pricing and revenue information; iv) artwork, editorial content and customer marketing information; v) historical customer service and problem-resolution information; and vi) projection and sales prospect information.[1] Uhlig additionally provided a description of how the information worked together to facilitate a valuable relationship with the specific customers and

---

[1]Uhlig also identified several individual documents as trade secrets. The documents contained specific methods or processes used to service customers, including proprietary worksheets, formulas, and equipment cost analyses. Defendants do not challenge the sufficiency of these trade secret identifications. Even if Defendants are correct in their assertions regarding infirmaries in the identifications of the compilations, there was sufficient evidence presented at trial concerning the trade secret status of some of the individual documents. Accordingly, the jury's verdict could be sustained on this ground alone.

provided an explanation of the collective effect of the information in a manner that could assist the trier of fact in a meaningful evaluation of the trade secret at issue.

Although Defendants attack Uhlig's identification of the compilation trade secrets at trial on the grounds that it failed to submit each and every document identified as part of the compilation for the jury's consideration, Defendants fail to demonstrate any authority which would require Uhlig to prove the existence of its trade secret in that manner. Further, the court is not persuaded by Defendants' argument that the documents identified by Uhlig as part of its compilation trade secrets were required to form a particular series or sequence or that they be stored in any specific manner. *See* S.C. Code Ann. § 39-8-20(5)(b) ("A trade secret *may* consist of a simple fact, item, or procedure, or a series or sequence of items or procedures . . . .") (emphasis added). By its express terms, the statutory language on which Defendants rely does not provide an exhaustive list of every type of trade secret.

At trial, Uhlig introduced some of the documents that comprised its trade secrets and submitted summary exhibits detailing the contents of the trade secrets. Uhlig presented testimony from its principal, Mark Uhlig, explaining the nature of the documents listed in the summary exhibits and explaining how the documents functioned together to form the trade secrets. The court finds that this was sufficient evidence from which the jury could have ascertained at least one trade secret which was misappropriated by Defendants. *See also* [Doc. 703].

**B. Existence of Trade Secrets**

Defendants further argue that Uhlig failed to submit any evidence to demonstrate the existence of the alleged trade secrets. Defendants contend that there was no evidence at trial to support Uhlig's claims that the identified trade secrets derived any independent economic value, that

the information was not readily ascertainable by proper means, or that the information was subject to reasonable efforts of protection.

Under the South Carolina Trade Secrets Act ("SCTSA"), information may be a trade secret only if it "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." S.C. Code Ann. § 39-8-20(5)(a). At trial, Mark Uhlig testified that the information was economically valuable because it represented a collective view of specific customer relationships that would allow someone to immediately compete for the customer's business without having to spend a significant amount of time researching the customer needs, preferences, and pricing tolerances. This testimony was corroborated by other witnesses including Amanda Dorsey Marcengill, who testified that the information could only be acquired over a significant amount of time. Therefore, there was some evidence at trial that the trade secrets derived economic value.

Mark Uhlig also testified that the trade secrets included information which was not in the customer's possession, such as cost, production and workflow information, and not readily ascertainable by proper means. Although Defendants contend that the individual components of the trade secrets could have been obtained by proper means from the customers, Defendants ignore that the value of the trade secrets is not in their individual components, but in their collective effect. Therefore, the more appropriate inquiry is whether the trade secret as a whole was readily ascertainable. Uhlig presented evidence that the trade secret could not be ascertained without substantial effort. Accordingly, even if Defendants could have eventually obtained the information

properly, Uhlig provided the jury with evidence from which it could have determined that the trade secret was not "readily" ascertainable.

Uhlig also provided evidence concerning its and CCM's efforts to maintain the secrecy of the information. Mark Uhlig testified that it required employees to sign confidentiality agreements. Uhlig also presented testimony from Tina Reusch regarding the protections CCM utlized to protect its information. She testified that CCM required network passwords and restricted access to certain information depending on the employee's job functions. Although Defendants attempted to make much of the fact that CCM did not routinely label documents as confidential, Uhlig presented testimony from former CCM employees, including Amanda Dorsey Marcengill and Tina Reusch, who conceded that they understood CCM's information to be confidential. It was well within the jury's province to conclude that CCM and Uhlig imposed reasonable efforts to protect the secrecy of the trade secrets.

### C. Evidence of Misappropriation and Injury

Defendants submit that Uhlig was required to show, by direct evidence, that Defendants actually used the trade secrets to prevail on a claim for misappropriation of trade secrets. While Uhlig did not present much, if any, direct evidence of use of the compilation trade secrets, it did provide the jury with substantial circumstantial evidence from which it could have determined that Defendants actually used the information. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ( "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'") (citations omitted). Most significantly, Uhlig presented evidence that Shirley resigned from his employment with CCM, taking a substantial amount of confidential

and trade secret information with him, and very shortly thereafter began servicing CCM's customers. Although direct evidence may have been preferable, the circumstantial evidence presented by Uhlig at trial is sufficient for the court to reject Defendants' arguments on this issue.

**Breach of Employment Agreement**

### A.  Assignment of Claims Arising from a Breach of the Employment Agreement

Defendants argue that the court should grant them a new trial on Uhlig's claim against Shirley for breach of his Employment Agreement because there was no evidence, or at the least a factual dispute, concerning whether CCM assigned the Employment Agreement to Uhlig.  As this court has repeatedly explained, the issue is not whether CCM assigned the actual Employment Agreement, but whether CCM assigned its rights to enforce the covenants and rights afforded under the Employment Agreement.

The general rule is that non-compete agreements are assignable in the context of the sale of a business. *See, e.g.*, *Equifax Servs., Inc., v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) ("[T]he right to enforce a covenant not to compete is generally assignable in connection with the sale of a business[.]") (citing RESTATEMENT (SECOND) OF CONTRACTS § 317 cmt. d illustration 6 (1981)); *Managed Health Care Assocs., Inc., v. Kethan*, 209 F.3d 923, 930 (6th Cir. 2000) (noting that following "the majority rule from other states that have addressed the issue," the Kentucky Supreme Court would hold that non-competition agreements are assignable under Kentucky law); *Reynolds and Reynolds Co. v. Tart*, 955 F. Supp. 547, 556-57 (W.D.N.C. 1997) ("As a general matter, a covenant not to compete with a business is assignable.") (internal quotation marks omitted) (citing supporting cases from multiple jurisdictions).

The court found that the Asset Purchase Agreement ("APA") between CCM and Uhlig not only effected the transfer to Uhlig of all of CCM's intellectual property assets including trade secrets, copyrights and trademarks, but also assigned to Uhlig all of CCM's causes of action and claims against third parties. Numerous courts have held that causes of action are assignable. *See, e.g.*, Moore v. Weinberg,  373 S.C. 209, 220, 644 S.E.2d 740, 745 (Ct. App. 2007) (South Carolina jurisprudence has long recognized that a chose in action can be validly assigned in either law or equity.") The APA was not ambiguous and Defendants presented no evidence to refute the clear language of the document.  Accordingly, the court correctly found that Uhlig could enforce the rights imposed by the Employment Agreement and Defendants are not entitled to a new trial on this matter.

## B.  Enforceability of Section 3(b) of the Employment Agreement

Defendants claim that the court erred in allowing Uhlig to proceed to trial on the claim that Shirley breached section 3(b) of the Employment Agreement, which restricted the solicitation of CCM employees, because the provision is unenforceable as against public policy and overly broad.

The enforceability of a restrictive covenant barring the solicitation of employees depends on whether the covenant is: "(1) necessary for the protection of the legitimate interest of the employer; (2) reasonably limited in its operation with respect to time and place; (3) not unduly harsh and oppressive in curtailing the legitimate efforts of the employee to earn a living; (4) reasonable from the standpoint of sound public opinion; and (5) supported by a valuable consideration." *Rockford Mfg., Ltd. v. Bennet*, 296 F.Supp.2d 681, 686 (D.S.C. 2003).  The court found that section 3(b) was enforceable and noted that section 3(b) was necessary to protect Uhlig's legitimate business interest. Particularly, Uhlig had a legitimate business interest in enforcing the nonsolicitation of employees provision arising out of its Leased Employee Agreement between it and CCM.  Additionally, the

16

provision is not overly broad simply because it restricts Defendants' ability to hire any CCM employee or independent contractor.  Furthermore, Defendants have not articulated any specific public policy against restricting a former employee's ability to lure away employees who have intimate knowledge of customer relationships and to take advantage of, arguably, one of the most valuable assets of a business.  Accordingly, the court appropriately found that section 3(b) is enforceable.

### C.  Breach of Section 3(b) of the Employment Agreement

Defendants claim that the court erred in making a finding that Shirley breached section 3(b) of the Employment Agreement because the agreement is unenforceable and because there was a factual issue concerning whether CCM or Uhlig abandoned the agreement.  The evidence presented at trial adequately established that Defendants solicited and hired Amanda Dorsey Marcengill and other CCM employees in violation of the Employment Agreement.  Defendants presented no evidence to refute this point.  Additionally, the court found that Uhlig was entitled to a directed verdict on Defendants' claims that CCM or Uhlig abandoned the Employment Agreement and, therefore, it could not be enforced.  A party to a contract abandons it by undertaking a positive and unequivocal act which is inconsistent with the existence of the contract. *See Ro-Lo Enters. v. Hicks Enters.*, 294 S.C. 111, 362 S.E.2d 888 (Ct. App. 1987).  Defendants provided no specific evidence in this case upon which a reasonable jury could have found that CCM or Uhlig positively and unequivocally abandoned the Employment Agreement. Therefore, the court correctly declined to instruct the jury on the issue of abandonment.

### D. Breach of Confidentiality Provision

Defendants further contend that Uhlig failed to identify any confidential information or to present any evidence to support the jury's finding that Shirley breached the provision. Although Defendants contend that Unhlig presented no evidence of confidential information, during trial Uhlig submitted evidence regarding the confidential nature of certain CCM information including information related to revenues and sales forecasts. Defendants also assert that there was no evidence that Shirley breached the confidentiality provision. However, like the claim for misappropriation of trade secrets, breach of the confidentiality provision could be proven by circumstantial evidence. Accordingly, the jury's verdict was adequately supported by the evidence in this case.

### E. Breach of Return of Documents Provision

Pursuant to the Employment Agreement, Shirley was required to return all CCM documents upon cessation of his employment with CCM. Shirley admitted that he took documents from CCM related to CCM customers. There was no evidence to establish that information about CCM customers did not "pertain" to CCM. Accordingly, there was no factual dispute to submit to the jury on this issue and the court properly found that Shirley breached this provision of the agreement.

### Breach of Fiduciary Duty

Defendants charge that Shirley is entitled to judgment as a matter of law or a new trial on Uhlig's claim against him for breach of fiduciary duty based on their contention that the claim for breach of fiduciary duty is not assignable and that Shirley did not owe a fiduciary duty to Uhlig.

Numerous courts have held that a cause of action for breach of fiduciary duty is assignable. *See, e.g.*, *Rosen v. Mega Blocks, Inc.*, No. 06 Civ. 3474 (LTS) (GWG), 2009 WL 929474, at * 11

(S.D.N.Y. Apr. 7, 2009) ("Under New York law, causes of action are freely assignable, and there is thus no reason a claim of breach of fiduciary duty may not also be assigned.") (internal citation omitted); *TMJ Hawaii, Inc. v. Nippon Trust Bank*, 153 P.3d 444, 455-56, 113 Hawai'i 373, 384-85 (Haw. 2007) (breach of fiduciary duty claim held to be assignable where injury at issue was financial in nature, and therefore nonpersonal); *Holiday Props. Acquisition Corp. v. Lowrie*, Nos. 21055, 21133, 2003 WL 1040162, at *3-4 (Ohio Ct. App. Mar. 12, 2003) (breach of fiduciary duty claim relating to injury to property was assignable); *Starview Ventures v. Acadia Ins. Co.*, No. CV065003463S, 2009 WL 5511543, at *9-10 (Conn. Super. Ct. Dec. 16, 2009) (holding breach of fiduciary duty claim to be assignable).

The court found that CCM assigned or otherwise transferred to Uhlig each of the claims asserted in the Third Amended Complaint by virtue of the APA between CCM and Uhlig. In addition, Uhlig presented evidence that Shirley was Uhlig's leased employee, and still owes a duty of loyalty and a fiduciary duty to the entity for which he was actively working. Furthermore, Uhlig has standing to assert these claims because it has "a . . . stake in the subject matter of the lawsuit" because Shirley's conduct, as a leased employee, affects it. *Sloan v. Greenville County*, 356 S.C 531, 547, 590 S.E.2d 338, 347 (Ct. App. 2001) (citing *Sea Pines Ass'n for the Prot. of Wildlife, Inc. v. South Carolina Dep't of Natural Res.*, 345 S.C. 594, 600, 550 S.E.2d 546, 549 (2001)).

Defendants also complain that Uhlig failed to present any evidence of damages caused by the breach of fiduciary duty. The record in this case contains a significant amount of direct evidence of Shirley's breach of fiduciary duties including his actions in taking confidential and trade secret information from CCM and also contains circumstantial evidence tending to show that his breach of fiduciary duty caused injury to Uhlig. Uhlig also submitted evidence that Shirley's actions

diminished the value of CCM as an acquisition target. Therefore, there was sufficient evidence in the record from which the jury could have found that Shirley caused injury to both Uhlig and CCM. Accordingly, Defendants are not entitled to judgment as a matter of law or a new trial on this issue.[2]

**Tortious Interference with Shirley's Employment Agreement and Aiding and Abetting Breach of Fiduciary Duty**

Defendants contend that they are entitled to judgment as a matter of law or, alternatively, a new trial on Uhlig's claims against Prism for tortious interference with Shirley's Employment Agreement and aiding and abetting breach of fiduciary duty. Defendants primarily argue that Prism cannot be held liable for these causes of action because it was not in existence at the time of Shirley's breach of his Employment Agreement or breach of his fiduciary duty.

Uhlig protests that it would be inequitable to allow Defendants to disclaim the existence of Prism to avoid liability while simultaneously retaining the benefits of Shirley's wrongful actions. The court agrees. Although Prism had not completed the formalities of legal existence as an LLC under South Carolina law, the undisputed evidence in the record demonstrates that Prism began functioning as a corporate entity prior to Shirley's breaches giving rise to these causes of action. Prism held itself out as an entity prior to the breaches in its dealings with L1 Technology, LLC. Additionally, even if Prism did not come into its legal existence until after the breaches, the evidence in the record demonstrates that it ratified Shirley's actions as agent when it received and retained the benefits of Shirley's wrongful conduct. *See* RESTATEMENT (SECOND) OF AGENCY § 98. Defendants

---

[2]Defendants also allege error in the court's jury instructions on the claim for breach of fiduciary duty. Defendants argue that the court failed to adequately distinguish between CCM and Uhlig based on the assignment of the cause of action. Defendants did not raise this objection at trial. Accordingly, it is waived. *See City of Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 453–54 (4th Cir. 1990); Fed. R. Civ. P. 51.

cited *Customer Effective, Inc. v. Colella*, C.A. No. 6:08-cv-02722-GRA, 2008 WL 5215650, at *3 (D.S.C. Dec. 11, 2008), in support of their position. While *Customer Effective, Inc.* did find that the acts committed in that case prior to the existence of the corporation could not be imputed, it does not appear that the parties in that case raised the issue of ratification. Accordingly, the court finds Defendants' argument unpersuasive.

**Tortious Interference with Prospective Contractual Relationships**

Defendants maintain that the court erred in failing to grant judgment in their favor as a matter of law on Uhlig's claim for tortious interference with prospective contractual relationships and, alternatively, request a new trial on the issue. In support of this argument, Defendants contend that Uhlig did not present any evidence of a valid contract or business expectancy. Defendants further contend that there was no evidence presented at trial to show that Defendants lacked justification or used any improper methods which caused any customer not to do business with Uhlig.

Contrary to Defendants' representations concerning the evidence, the record is replete with testimony from Mark Uhlig and former CCM employees concerning the status of CCM's customer relationships at the time of the acquisition and Uhlig's expectations that it would continue those relationships. Additionally, the primary evidence submitted in this case concerned Defendants' use of confidential and trade secret information to gain a competitive advantage over Uhlig in servicing these customers and others. It belies reason for Defendants to argue that there was no evidence at all of improper methods. Moreover, Defendants continue this familiar refrain of insisting on direct evidence to support Uhlig's claims. As the court has repeatedly stated, Uhlig was free to prove its case by circumstantial evidence and the fact that it relied on such evidence does not invalidate the jury verdict.

21

**Damages Attributable to Brookdale and Sunrise**

Defendants claim that they are entitled to judgment as a matter of law as to the damages attributable to customers Brookdale and Sunrise because there is no evidence that Defendants caused the customers not to do business with Uhlig. During trial, Uhlig presented evidence demonstrating that Shirley engaged in correspondences with these customers and attempted to frustrate Uhlig's ability to transition these customer accounts after its acquisition of CCM assets. This evidence was sufficient to create a factual issue for the jury's resolution and the court did not err in submitting these issues to the jury.

**Preemption of Certain Claims**

Defendants argue that Uhlig's claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and tortious interference with prospective contractual relationships are preempted by the SCTSA. For the reasons set forth in the court's Order on Defendants' Motion for Plaintiff to Elect and Preemption [Doc. 1050], the court rejects Defendants' arguments on this matter.

**Prism's Counterclaim for Declaratory Judgment**

Defendants maintain that they are entitled to a new trial on Prism's counterclaim for a declaratory judgment concerning the rights and obligations of Prism and Uhlig with respect to the ownership of a website developed by Chris Jones and L1 Technology, LLC because the court erred in directing a verdict in favor of Uhlig.[3] In its counterclaim, Prism requested a declaration that it was

---

[3]The court found that Defendants had not provided sufficient evidence of Prism's ownership of the website source code and, therefore, Uhlig was entitled to judgment as a matter of law. However, the court declined to extend its ruling to declare that Uhlig was the rightful owner of the website source code.

the sole owner or joint owner of the source code underlying the website at issue. Alternatively, Prism sought a declaration that it had an express or an implied license to use and modify the source code.

After the close of evidence, Defendants argued that Prism was the sole owner of the source code by virtue of it being a work made for hire. A "work made for hire" is defined as either "a work prepared by an employee within the scope of his or her employment," or a specially commissioned work "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." *See* 17 U.S.C. § 101. The court directed a verdict in favor of Uhlig on this claim because Defendants failed to submit any evidence of a signed written agreement indicating that the work was intended to be a work made for hire. Although Defendants make many arguments concerning the intent between Prism and L1 Technology, LLC, Defendants have not cited any evidence in the record which shows the existence of the written agreement as required by the Copyright Act.

Additionally, because there was no evidence of a written agreement between Prism and the website developers concerning licensing, the court directed a verdict in favor of Uhlig on Defendants' request for a declaration that Prism had an exclusive express license. *See* 17 U.S.C. § 204(a) (requiring an agreement to transfer exclusive copyright interests to be in a signed writing).

Defendants also argued that Prism was the joint owner of the source code by virtue of it having directed the website developers regarding the desired appearance and functionality of the website. "A person who merely describes to an author what the commissioned work should do or look like is not a joint author for purposes of the Copyright Act. . . . To be an author, one must supply more than mere direction or ideas: one must 'translate [ ] an idea into a fixed, tangible

expression entitled to copyright protection.'" *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989) (citing *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)). Accordingly, the court correctly determined that Prism could not be a joint owner in the source code.

Defendants additionally contend that any copyright interest held by L1 Technology, LLC, or any other website developer was effectively abandoned when the Prism copyright notice was placed on the website. However, even assuming Defendants are correct on the abandonment issue, the evidence submitted by Defendants was still insufficient to support a finding that Prism was the rightful owner of the source code for the website; particularly here, where there were unresolved issues concerning L1 Technology, LLC's assignment of rights in the source code to Uhlig. Because Defendants did not request a declaration of rights as between L1 Technology, LLC and Uhlig, the court declined to declare any rights of ownership on the basis of abandonment.

The court further determined that it could not rule on Prism's claim for a declaration that it had an implied license to the source code because this issue also was not properly before the court. The assertion of an implied license is an affirmative defense to a claim of copyright infringement. No such claim was made in this case. *See Nelson-Sabales, Inc. v. Morningside Dev.*, *LLC,* 284 F.3d 505, 513 (4th Cir. 2002). Accordingly, the court appropriately declined to rule on the matter.

**Defendants' Counterclaims against Uhlig and CCM**

Defendants assert that the court erred in granting summary judgment to Uhlig and CCM on Defendants' counterclaims. Inasmuch as Defendants rely solely on their previous submissions to the court on these issues and do not raise any particular point of error in the court's prior orders addressing these matters, the court denies Defendants' request for a new trial on the counterclaims for the reasons set forth in the court's Order on CCM's Motion for Summary Judgment [Doc. 685],

Order on Uhlig's Motion for Partial Summary Judgment [Doc. 698], Order on Defendants' Motion for Partial Reconsideration of Order Granting Summary Judgment to Cox Custommedia, Inc. [Doc. 739], and Order on Defendants'Motion for Partial Reconsideration of the Order on Defendants' Motion for Summary Judgment [Doc. 773].

**Admission of Evidence Concerning Prism's Revenue**

Defendants contend that the court erred in allowing Uhlig to present evidence concerning Prism's revenues and profits without requiring Uhlig to deduct all of Defendants' expenses. It is well-established that a plaintiff may seek disgorgement of profits as a measure of damages for infringement or misappropriation of an intellectual property right. *See, e.g.*, *Christopher Phelps & Associates, LLC v. Galloway*, 492 F.3d 532, 540-41 (4th Cir. 2007); *Carter Products, Inc. v. Colgate-Palmolive Co.*, 214 F. Supp. 383, 397- 409 (D. Md. 1963); Michael A. Rosenhouse, *Proper Measure and Elements of Damages for Misappropriation of Trade Secrets*, 11 A.L.R.4th 12 (1982). In pursuing damages on a disgorgement of profits theory, the plaintiff need only submit evidence of the defendant's revenues. *Id*. It is the defendant's burden to prove any expenses deductible from the revenue figure submitted by the plaintiff. *Id*.

Here, while the court did allow Uhlig to present evidence concerning Prism's revenues and profits for the jury's consideration in awarding damages, the court provided Defendants with a detailed ruling indicating that Defendants had the burden of proving its expenses and clarifying the categories of expenses which the court would allow Defendants to present to the jury. *See* Text Order on Defendants' Allowable Costs and Expenses [Doc. 954]. After engaging the court and Uhlig in substantial discussions concerning the matter, Defendants closed their case without

presenting a single piece of evidence concerning expenses. Accordingly, the court did not err in allowing Uhlig to present evidence of Prism's revenues and profits.

**Admission of Dr. Perry Woodside's Testimony**

Defendants contend that they are entitled to a new trial because the court erred in allowing the testimony of Uhlig's damages expert, Dr. Perry Woodside. Defendants primarily refer to their Motion in Limine [Doc. 852] as the basis for this argument. To the extent that Defendants do not make any specific assignment of error in the court's admission of this testimony, the court denies Defendants request for the reasons set forth in the court's Order on Defendants' Motion in Limine [Doc. 921].

Defendants, however, specifically complain that the court erred in allowing Dr. Woodside to render an opinion as to future damages without accounting for the present value of those damages. It is well established that a plaintiff has the burden to prove its damages with reasonable certainty. *See, e.g., Gray v. Southeastern Facilities, Inc.*, 256 S.C. 558, 570-71, 183 S.E.2d 438, 444 (1971) ("While proof, with mathematical certainty, of the amount of loss or damage is not required, in order for damages to be recoverable the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy. Neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation."). However, the United States Court of Appeals for the Fourth Circuit has found that a defendant bears the burden to produce evidence of any method of damages calculation from which it would receive the benefit. *See Aldridge v. Baltimore and Ohio R. Co.*, 789 F.2d 1061 (4th Cir. 1986) (discussing the proposition that the party who would benefit from the application of a particular economic formula has the burden of producing competent evidence to prove it).

26

The court found that it would not be appropriate to exclude Dr. Woodside's testimony for his failure to provide a present value calculation. Defendants were free to attack the accuracy of Dr. Woodside's opinion on the issue of damages, either by cross-examination or by presenting their own evidence concerning damages. Defendants did neither. Accordingly, Defendants are not entitled to a new trial on this ground.

**Admission of Summary Exhibits**

Defendants assert that a new trial is warranted because the court erred in allowing Uhlig to present evidence concerning the compilation of its trade secrets by the use of summary exhibits. Rule 1006 of the Federal Rules of Evidence allows a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. The court has broad discretion to admit summary exhibits into evidence, provided that the underlying evidence would be admissible and that the underlying evidence is available to the opponent. *See id*; *United States v. Strissel*, 920 F.2d 1162, 1164 (4th Cir. 1990).

The court allowed Uhlig to present its trade secret compilations at trial through the use of summary exhibits. However, the court required Uhlig to lay a proper foundation and admonished Uhlig to refrain from including any information in the summaries which would encourage the jury to draw inferences that were not warranted by the underlying materials. Additionally, the court required Uhlig to present the summaries along with admissible summary testimony. Uhlig met these requirements. Therefore, the court did not err in admitting the summaries and Defendants are not entitled to a new trial on this basis.

**Smith Hines Road Documents**

Defendants argue that they should be granted a new trial because the court erred in excluding evidence of Defendants' discovery of documents at a facility formerly occupied by CCM located on Smith Hines Road. Inasmuch as Defendants rely solely on their previous submissions to the court on these issues and do not raise any particular point of error in the court's prior orders addressing these matters, the court denies Defendants' request for a new trial based on the exclusion of this evidence for the reasons set forth in the court's Order on Uhlig's Motion for Evidentiary Sanctions Precluding Defendants from Using the Smith Hines Road Materials [Doc. 900] and Order on Defendants' Motion for Sanctions for Spoliation of Evidence Against Uhlig, LLC [Doc. 902].

**Admission of Al Johnson's Testimony**

Defendants request a new trial on the ground that the court erred in admitting the testimony and other evidence related to Uhlig's expert witness, Al Johnson. Inasmuch as Defendants rely solely on their previous submissions to the court on these issues and do not raise any particular point of error in the court's prior orders addressing these matters, the court denies Defendants' request for a new trial based on the admission of this testimony and evidence for the reasons set forth in the court's Order on Defendants' Motion in Limine [Doc. 921] and Order on Uhlig's Motion in Limine [Doc. 925].

**Defendants' Motion for Mistrial**

Defendants assert that they are entitled to a new trial because the court erred in failing to grant their motion for a mistrial after Uhlig's counsel made reference to the court's Order concerning the preliminary injunction entered in this case. The decision whether to grant or deny a mistrial is committed to the discretion of the trial court. *United States v. Smith*, 44 F.3d 1259, 1268 (4th Cir.

1995). "In making such a determination, the district court should consider whether there are less drastic alternatives to declaring a mistrial." *Id*.

During the direct examination of Shirley, Uhlig's counsel asked a question which made reference to the court's order granting the preliminary injunction which required Shirley to return or destroy all documents belonging to Uhlig. Defendants' counsel immediately objected. After much discussion, the court denied Defendants' motion for a mistrial and determined that it was more appropriate to strike the question and instruct the jury to disregard the statement. Uhlig's counsel only made a brief reference to the order and Shirley was not required to answer the question. Accordingly, Defendants were not unduly prejudiced and the court did not err in exercising its discretion to deny the motion for a mistrial in favor of a curative instruction.

**Admission of Spreadsheets**

Defendants contend that they were prejudiced by the admission of certain spreadsheets containing forensic information concerning the files that Uhlig's computer forensic expert found on the electronic devices in Defendants' possession. Upon Defendants' objection, Uhlig indicated that the spreadsheets were relevant because it contained a listing of all of the documents contained on electronic media devices in Shirley's possession at the time he left CCM's employ. Uhlig further indicated that the spreadsheet would serve as a basis for its expert witness, Mark Johnson's, testimony. Defendants were free to attack the contents of the spreadsheet or present additional evidence regarding the substance of the documents contained on the electronic media devices and did, in fact, do so. In accordance with the ruling at trial, the court finds that the spreadsheets were sufficiently relevant to the issues raised in the case to be admissible into evidence and that the spreadsheets were not unduly prejudicial.

**Jury Instructions**

Defendants alleged several points of error in the instructions given by the court to the jury on Uhlig's claim for misappropriation of trade secrets and the appropriate measure of damages. The court instructed the jury as follows:

> Plaintiff claims that Defendants Shirley and Prism misappropriated its trade secrets. Under the South Carolina Trade Secrets Act, an aggrieved party can sue to recover damages incurred as a result of a misappropriation. In order to establish a trade secret violation, Plaintiff has the burden of proving by a preponderance of the evidence: the existence of a trade secret and misappropriation of the trade secret. I will instruct you on each.

> In considering Plaintiff's claim for misappropriation of a trade secret, you must first determine whether any of the items identified by Plaintiff constitute a "trade secret" under the law. A trade secret is defined by the South Carolina Trade Secrets Act as:

> Information including, but not limited to, a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, proper means by the public or any other person who can obtain economic value from its disclosure, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

> A trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy. The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.

> In considering whether an alleged trade secret is readily ascertainable by proper means, the fact that part, or even eventually all, of the components of a trade secret are matters of public knowledge does not prohibit a claim of trade secret. The focus of the inquiry is an analysis of the trade secret as a whole and not the general knowledge of individual items of the trade secret.

Further, information alleged to be a trade secret must be subject to reasonable efforts to maintain its secrecy and must not be of public knowledge or of a general knowledge in the trade or business. Absolute secrecy is not required. However, the efforts used to maintain secrecy must be reasonable under the circumstances to prevent disclosure of the alleged trade secret to those who may exploit it to the detriment of the owner. Under South Carolina law, a plaintiff's requirement to demonstrate reasonable efforts to maintain secrecy is a heavy burden. A Plaintiff must make consistent warnings to those to whom the trade secret has become known and obtain acknowledgments or promises from those persons to maintain such secrecy. A trade secret endures and is protectable and enforceable until it is disclosed or discovered by proper means.

In determining whether Plaintiff has proven by a preponderance of the evidence that it possessed trade secrets, you may consider the following factors: (1) The extent to which the information was known by proper means outside of Plaintiff's business; (2) The extent of measures taken by Plaintiff to maintain the secrecy of the information; (3) The value of the information to Plaintiff and its competitors; (4) The amount of effort or money expended in developing or acquiring the information; and (5) The ease or difficulty with which the information could be properly acquired or duplicated by others. The trade secret must be sufficiently identifiable to distinguish it from the mere skills and general knowledge which may be obtained by anyone as a result of being employed in the industry. I will next instruct you on the proper considerations should you find that any trade secret exists.

If you find that Plaintiff has not proved the existence of any trade secret, you must find for the Defendants. If you find that Plaintiff has proved the existence of any trade secrets, you then must consider whether any of Defendants misappropriated any of the Plaintiff's trade secrets. "Misappropriation" means:

(a) acquisition of a trade secret of another by a person by improper means;

(b) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(c) disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i) used improper means to acquire knowledge of the trade secret; or

    (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired by mistake or under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

"Improper means" include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, duties imposed by the common law, statute, contract, license, protective order, or other court or administrative order, or espionage through electronic or other means. If Plaintiff meets its burden of demonstrating that any Defendant acquired, disclosed, or used trade secret information improperly, the Defendant then has the burden of demonstrating that the Defendant actually obtained the trade secret through proper means. A Defendant may not defeat a claim of misappropriation by merely showing that the trade secret was publicly available if the Defendant did not actually use the publicly available method to gain access to the trade secret.

Every employee who is informed of or should reasonably have known from the circumstances of the existence of any employer's trade secret has a duty to refrain from using or disclosing the trade secret without the employer's permission independently of and in addition to any written contract of employment, secrecy agreement, noncompete agreement, nondisclosure agreement, or other agreement between the employer and the employee.

If you find that Plaintiff has not proven the existence of any trade secret or if you find that any Defendant has not misappropriated any of Plaintiff's trade secrets, you must return a verdict for each such Defendant on this cause of action. If you find that Plaintiff has proven the existence of a trade secret and that any Defendant has misappropriated any of Plaintiff's trade secrets, you must then decide the amount of damages Plaintiff is entitled to recover, if any, against each Defendant.

Jury Instructions at pp. 9-12 [Doc. 982].

Defendants first point of error concerns the court's instruction to the jury regarding Defendants' burden to demonstrate that they actually obtained the trade secret information through proper means. Throughout this litigation, the parties have consistently merged the requirements to prove the existence of a trade secret with the requirements to prove misappropriation of trade secrets under South Carolina. In the Order on Uhlig's Motion in Limine [Doc. 927], this court clearly

distinguished the requirements of the separate elements of a claim of misappropriation of trade secrets. As the court previously noted, evidence of public disclosure or public availability of components of a trade secret are relevant to a determination of whether a trade secret exists regardless of whether the defendant actually relied on such disclosures. *See Atwood Agency v. Black*, 374 S.C. 68, 646 S.E.2d 882 (2007). However, the determination of whether a defendant misappropriated a trade secret requires evidence concerning whether the defendant acquired the secret by "improper means." *See* S.C. Code Ann. § 39-8-20(2)(defining "misappropriation") *and* S.C. Code Ann. § 39-8-20(1)(defining "improper means"). Given the clear meaning of the statutory definitions, it would be illogical to allow a defendant to defeat claims of misappropriation simply by presenting evidence that they could have procured the trade secrets from a proper source. Once Uhlig brought forth evidence that the trade secrets were obtained by improper means, Defendants were required to demonstrate some evidence to the contrary which could only be evidence tending to show that Defendants properly obtained the trade secrets. *See also* Order on Uhlig's Motion in Limine [Doc. 927]. Accordingly, the court appropriately instructed the jury on the differences between these elements of Uhlig's claims.

Defendants next contend that the court erred in refusing several of their proposed instructions concerning their view of the proof required to establish the existence of a trade secret. Defendants expressly allege error in the court's refusal to charge the following requested instructions:

- that it must determine that Plaintiff possessed "specific, identifiable trade secrets" since this is a requirement under the law and Plaintiff could not maintain its misappropriation of trade secrets claim without such proof;

- as to the elements of a claim for misappropriation of trade secrets under South Carolina law as found in *Nucor v. Bell* since such elements are the law in South Carolina and provide necessary guidance to the jury;

33

- that "a trade secret which is allegedly based on collection or combination or series or sequence of items or procedures must have existed as a combination or collection at the time Defendant Shirley was employed and cannot be a protectable trade secret if it was collected or put together after Defendant Shirley ended his employment or for the purposes of the lawsuit;"

- that "trade secret protection is limited. A trade secret must be secret;"

- that "in considering whether information is generally known or readily ascertainable, consideration is given not to whether the information generally known or read to the general public. [sic] You must consider whether based on the defendant's knowledge and experience it was information known or ascertainable to them;" and

- that "in a given industry information is generally known and/or readily ascertainable when it is known to customers, can be discovered from other sources and would be acquired over the course of time without efforts beyond those ordinarily exerted by salesmen in developing customers or can be disclosed by reversed engineering."

- that "[a]n agent who gains general skills and knowledge and forms relationships with customers and co-workers during the course of his employment may use such skills, knowledge, and relationships to compete with his former employer once the employment is terminated."

*See* Defendants' Memorandum in Support of Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial at p. 34 [Doc. 999-1].

The court determined that Defendants' requested instructions were unbalanced and unnecessarily buttressed Defendants' position over Uhlig's. Additionally, the court found that the instructions requested by Defendants would have required excessive explanation and would have required the court to comment on the weight of the evidence. Ultimately, the court determined that the statutory language of the SCTSA accurately and fairly encompassed the law which should be charged to the jury on the issue of misappropriation of trade secrets.

Finally, Defendants claim that the court erred in not instructing the jury that "[a]ny future damages that you award must be reduced to their present-day value." *Id*. However, there was no evidence presented at trial from which the jury could have determined the applicable discount rate. The court is not required to instruct the jury regarding the discounting of damages if there is no evidence in the record to assist them in doing so. *See Aldridge v. Baltimore and Ohio R. Co.*, 789 F.2d 1061, 1068-69 (4th Cir. 1986) (holding that the trial court does not commit error in failing to give a jury instruction concerning economic adjustments in the absence of any evidence on the issue).

In determining the adequacy of jury instructions, the court must look to "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Roger Cleveland Golf Co., Inc. v. Prince*, No. 2:09–2119–MBS, 2012 WL 1106775, at *8 (D.S.C. Mar. 30, 2012) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir.1987)). Viewing the instructions as a whole and in consideration of the record in this case, the court accurately charged the jury on the law applicable to the case.

**Admission of Gerald Wiatrowski Testimony**

Defendants allege that the court erroneously admitted testimony from Gerald Wiatrowski concerning: 1) his interpretation of his employment agreement, which was substantially similar to Shirley's Employment Agreement; 2) contents of a document produced by Prism; 3) his views on the appropriateness of Shirley's actions in taking certain documents; 4) his views on the appropriateness of Shirley's actions in taking certain graphics; and 5) his views regarding CCM's

trade secrets on the grounds that the testimony was irrelevant, misleading, or lacked a proper foundation.

Mr. Wiatrowski's testimony was presented by deposition. Prior to the beginning of trial, each party designated certain portions of the deposition to be read into evidence. The parties also submitted written objections to the designations. However, at the time of the presentation of Mr. Wiatrowski's testimony, the parties waived many of their objections to his testimony. Additionally, the court painstakingly combed through pages of Mr. Wiatrowski's deposition and overruled Defendants' objections to this testimony on the basis of lack of foundation. Despite Defendants' arguments to the contrary, Mr. Wiatrowski had sufficient knowledge of the matters addressed in his testimony which he gained in his capacity as an officer of CCM. Additionally, the court found his testimony to be relevant to the issues in the case. Accordingly, Defendants have failed to demonstrate any abuse in the court's exercise of its discretion in allowing Mr. Wiatrowski's testimony.

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendants John Adam Shirley and Prism Content Solutions, LLC's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial [Doc. 999] is **DENIED**.

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

July 17, 2012
Greenville, South Carolina